**Page 1**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CANDICE BUCKNER,

    Plaintiff,

vs.    Case No.: 3:13-cv-578-J-2-JRK

JOHN RUTHERFORD, in his official
capacity as Sheriff of the Consolidated
City of Jacksonville, Florida, et al.,

    Defendants.

_____

DEPOSITION OF CANDICE BUCKNER

DATE:    Friday, March 14, 2014

TIME:    1:00 p.m. - 2:35 p.m.

PLACE:    First Coast Court Reporters
    2442 Atlantic Boulevard
    Jacksonville, Florida  32207

Examination of the witness taken before:

Ellen G. Watterson, RPR, FPR,
Notary Public, State of Florida

FIRST COAST COURT REPORTERS
2442 ATLANTIC BOULEVARD
JACKSONVILLE, FLORIDA  32207   (904) 396-1050

**Page 3**

I N D E X

WITNESS                 PAGE

CANDICE C. BUCKNER

Direct Examination by Mr. Phillips..........4

Cross-Examination by Mr. Vogelsang.........62

Redirect Examination by Mr. Phillips.......77

No exhibits

**Page 2**

A P P E A R A N C E S

**BRYAN E. DEMAGGIO, Esquire**

of the law firm of
Sheppard, White, and Kachergus, P.A.,
215 Washington Street
Jacksonville, Florida  32202

appearing on behalf of the Plaintiff.

**JON R. PHILLIPS, Esquire**

Office of General Counsel
117 West Duval Street, Suite 480
Jacksonville, Florida  32202

appearing on behalf of the Defendant,
John Rutherford.

**PHILLIP VOGELSANG, Esquire**

Fraternal Order of Police Building
5530 Beach Boulevard
Jacksonville, Florida  32207

appearing on behalf of the
Individual defendant officers.

CERTIFIED
COPY

**Page 4**

S T I P U L A T I O N

It was stipulated and agreed by and between counsel for the respective parties that the reading and signing of the deposition by the witness be reserved.

    - - -

**CANDICE CHRISTINA BUCKNER,**

having been produced and first duly sworn as a witness on behalf of the Defendants, testified as follows:

**DIRECT EXAMINATION**

BY MR. PHILLIPS:

13:06    Q  Would you state your full name, please.

13:06    A  Candice Christina Buckner.

13:06    Q  How do you spell your middle name?

13:06    A  C-h-r-i-s-t-i-n-a.

13:06    Q  And what's your occupation?

13:06    A  I work as a firefighter/paramedic for Jacksonville Fire Rescue and I'm also a registered nurse.

13:06    Q  Ms. Buckner, I'm Jon Phillips. I'm from the OGC. I represent the City here or the Sheriff in his official capacity, and this is Mr. Vogelsang who represents the individual defendants.

13:06 1    What's your understanding of why we're
13:06 2    here today?
13:06 3    **A   To take a deposition to possibly prepare**
13:06 4    **for either trial or a settlement hearing.**
13:07 5    Q   Just to go over a couple of things with
13:07 6    you and, before I do that, have you had your
13:07 7    deposition taken before?
13:07 8    A   Yes, sir.
13:07 9    Q   So you sort of understand the drill?
13:07 10   A   Yes, sir.
13:07 11   Q   You understand this is an important step
13:07 12   in your lawsuit?
13:07 13   A   Yes, sir.
13:07 14   Q   And that you have an obligation to
13:07 15   testify truthfully, honestly, and completely?
13:07 16   A   Yes, sir.
13:07 17   Q   A couple things just to remind you in
13:07 18   case -- in the unlikely event that you weren't
13:07 19   reminded by Bryan.
13:07 20       First of all, we already went over one
13:07 21   of them and that is that we have a court reporter
13:07 22   here who's taking down your testimony, but if you
13:07 23   talk really fast, it's hard for her.
13:07 24       So if you could make an effort -- I
13:07 25   notice that you do sort of talk fast and, if you

6

13:07 1    could slow it down a little bit, it would make it
13:07 2    easier for her to get everything accurately.
13:07 3    Okay?
13:07 4    A   Yes, sir.
13:07 5    Q   Also, in normal conversation people have
13:07 6    a tendency to talk over each other so that, if
13:07 7    you and I are just talking, I might ask you a
13:08 8    question and, when you understood what the
13:08 9    question was going to be, you might start
13:08 10   answering it before it was actually finished and,
13:08 11   consequently, you know, I might, in turn,
13:08 12   interrupt your answer when I -- when you answer
13:08 13   enough of the question to where I felt like you
13:08 14   had answered the question.  And it is, however,
13:08 15   very difficult for the court reporter to take
13:08 16   down two people talking at once.
13:08 17       So if you could kindly try to let me
13:08 18   finish my questions and I will, in turn, try not
13:08 19   to interrupt your answers.
13:08 20   A   Yes, sir.
13:08 21   Q   Is that fair?
13:08 22   A   (Nods head affirmatively.)
13:08 23   Q   And one more thing:  If I ask you a
13:08 24   question that you don't understand or it doesn't
13:08 25   make sense to you, please just say so and I'll be

13:08 1    happy to rephrase it.  Is that fair?
13:08 2    A   Yes, sir.
13:08 3    Q   Otherwise I'm just going to assume, if
13:08 4    you didn't mention it to me, that you did at
13:08 5    least think you understood the question and
13:08 6    intended to answer it as asked.
13:09 7    A   Yes, sir.
13:09 8    Q   How long have you worked for the City of
13:09 9    Jacksonville?
13:09 10   A   Nine years -- almost ten years.  Nine
13:09 11   years and seven to eight months now.
13:09 12   Q   And have you always worked with the fire
13:09 13   department?
13:09 14   A   I'm not understanding.
13:09 15   Q   And that's fair enough.
13:09 16       During the time you worked for the City
13:09 17   of Jacksonville's Fire and Rescue Department,
13:09 18   have you ever worked anywhere else for the city?
13:09 19   A   No, sir.
13:09 20   Q   Before you got hired by the city, where
13:09 21   did you work?
13:09 22   A   I worked for a private ambulance service
13:09 23   by the name of Ambulance Service, Incorporated,
13:09 24   or ASI.
13:09 25   Q   I'm sorry; what kind of service?

8

13:09 1    A   It's a private ambulance service.
13:09 2    Q   Oh, ambulance.
13:09 3    A   Yes, sir.
13:09 4    Q   All right.  What was your rank when you
13:09 5    were hired as a firefighter?
13:09 6    A   Firefighter.
13:09 7    Q   And did you then advance through the
13:10 8    ranks?
13:10 9    A   Yes, sir.
13:10 10   Q   What is your current rank?
13:10 11   A   I'm a lieutenant in the rescue division.
13:10 12   Q   And how many steps above firefighter is
13:10 13   a lieutenant?
13:10 14   A   It's two civil service pay grade
13:10 15   changes.
13:10 16   Q   And what was -- so let me -- is that the
13:10 17   second one then?
13:10 18   A   Yes, sir.
13:10 19   Q   So it's firefighter and then something
13:10 20   and then lieutenant.
13:10 21   A   Yes, sir.
13:10 22   Q   What's the something in the middle?
13:10 23   A   Engineer.
13:10 24   Q   And above lieutenant the next step would
13:10 25   be what?

13:10  1    A   Captain.
13:10  2    Q   And above that?
13:10  3    A   Chief.  It would be a district chief.
13:10  4    Q   And during the course of your employment
13:10  5  with the fire department, have you had occasion
13:10  6  to be disciplined by the department?
13:10  7    A   I'm not understanding the question.
13:10  8    Q   Have you ever been disciplined by the
13:10  9  department?
13:10 10    A   And I'm not trying to be difficult.
13:10 11  There are several ways that this can be looked
13:11 12  at, and I'm trying to understand the city's view
13:11 13  versus internal fire department view.
13:11 14        Have I ever received and sustained
13:11 15  formal discipline, or have I ever been charged
13:11 16  and initially disciplined?
13:11 17    Q   All right.  Well, that's fair enough.
13:11 18        Have you ever had a discipline imposed
13:11 19  upon you that ended up getting upheld?
13:11 20    A   No, sir.  The one formal discipline that
13:11 21  I've had was actually reverted.
13:11 22    Q   And how did that happen?
13:11 23    A   I don't know the intricacies of the
13:11 24  politics that were involved.  I know that I was
13:11 25  initially charged with several minor rule

10

13:11  1  infractions and then, six to eight months later,
13:11  2  the rule infraction charges were dropped and I
13:11  3  was given a written warning.
13:11  4    Q   Did you ever have a civil service
13:11  5  proceeding?
13:11  6    A   No, sir.
13:11  7    Q   When was that discipline --
13:11  8    A   August of --
13:11  9    Q   -- that got reverted?
13:11 10    A   The incident or the discipline that was
13:11 11  reverted?
13:11 12    Q   When was it first imposed on you and --
13:12 13    A   I was initially charged with rule
13:12 14  infraction charges August -- early August of
13:12 15  2012, and the charges were later downgraded to a
13:12 16  written reprimand, I want to say, November or
13:12 17  December of the same year.
13:12 18    Q   All right.  Now, was it a warning or a
13:12 19  written reprimand?
13:12 20    A   It's gone back and forth several times.
13:12 21  I honestly don't know.  I know that it was
13:12 22  downgraded to the lowest possible level.
13:12 23    Q   And I don't know the answer to this, so
13:12 24  I'm just trying to find out.
13:12 25        It's my understanding that there's a

13:12  1  difference between counseling and an actual
13:12  2  written reprimand.
13:12  3    A   Correct.
13:12  4    Q   And it's my understanding that the
13:12  5  counseling would not count as a discipline and a
13:12  6  reprimand would count as a discipline, but it is
13:12  7  the lowest level of discipline.
13:12  8    A   Correct.
13:12  9    Q   And having now answered those two
13:13 10  questions, do you have any recollection what the
13:13 11  outcome of your case was?
13:13 12    A   I don't because it's changed so many
13:13 13  times.
13:13 14    Q   So --
13:13 15    A   And that's not my --
13:13 16    Q   Do you think you got a written
13:13 17  reprimand?
13:13 18    A   I think it was dropped to a warning, but
13:13 19  I honestly don't know.  Like I said, the union
13:13 20  was involved and there were several people that
13:13 21  were brought up on the same sets of charges, and
13:13 22  I don't remember the final disposition.  I was
13:13 23  told leave it alone.
13:13 24    Q   Were you represented by counsel in that
13:13 25  case?

12

13:13  1    A   Counsel as in an attorney?
13:13  2    Q   Yes.
13:13  3    A   I believe Paul Donnelly represented the
13:13  4  union.  Individually, no.  I never retained
13:13  5  formal counsel in that.
13:13  6    Q   Have you filed any other lawsuits
13:13  7  against the city?
13:13  8    A   Have I filed an actual lawsuit?  No.
13:13  9    Q   And have you filed any EEOC complaints
13:14 10  against the city?
13:14 11    A   Yes, I have.
13:14 12    Q   How many of those have you filed against
13:14 13  the city?
13:14 14    A   Again, not trying to be difficult.  How
13:14 15  many have been filed or how many have been
13:14 16  threatened to have been filed by my attorney?
13:14 17    Q   How many have been filed?
13:14 18    A   I believe only one.
13:14 19    Q   Is it still pending?
13:14 20    A   I'm waiting for an answer on that
13:14 21  myself, honestly.  I have asked several times.
13:14 22  It's been more than 180 days, so I don't know
13:14 23  what the disposition is.
13:14 24    Q   Is it still pending in front of the
13:14 25  EEOC?

13

13:14 1    A   I don't know.

13:14 2    Q   So you don't know what, if anything, the

13:14 3 EEOC did with respect to your complaint?

13:14 4    A   No, sir.  I've reached out to that

13:14 5 attorney earlier this week, and I'm waiting for

13:14 6 an answer back.  It was my understanding she was

13:14 7 to have a conference call, and I've not received

13:14 8 an answer.

13:14 9    Q   Is the attorney you're referring to an

13:14 10 employee of the EEOC or your attorney?

13:14 11    A   Personal attorney.

13:14 12    Q   But it's not Mr. DeMaggio?

13:14 13    A   No, sir.

13:14 14    Q   So a different firm?

13:14 15    A   Yes, sir.

13:14 16    Q   With respect to the lawsuit that brings

13:15 17 us here today, how did this first come about, if

13:15 18 you can explain that for us in your own words?

13:15 19    A   How did what come about?

13:15 20    Q   Your decision to file -- and I don't

13:15 21 mean to ask you about anything that you discussed

13:15 22 with your attorney.  I'm just asking you what

13:15 23 prompted you to decide to file a lawsuit?  What

13:15 24 were the facts that --

13:15 25    A   Police officers that are currently

FIRST COAST COURT REPORTERS

14

13:15 1 employed with the City of Jacksonville Sheriff's

13:15 2 Office who decided to stomp all over my civil

13:15 3 rights.

13:15 4    Q   Now, as I understand it, you previously

13:15 5 had complained about Officer Collier to Internal

13:15 6 Affairs?

13:15 7    A   Sergeant Collier, yes.

13:15 8    Q   Thank you.  It's also my understanding

13:16 9 that you've had a previous personal relationship

13:16 10 with Sergeant Collier?

13:16 11    A   Yes.  We were formerly engaged and have

13:16 12 a child in common together.

13:16 13    Q   And how old is the child?

13:16 14    A   He'll be three on Tuesday.

13:16 15    Q   Does he live with you?

13:16 16    A   Yes, he does.

13:16 17    Q   Does Sergeant Collier have visitation?

13:16 18    A   He does.

13:16 19    Q   And is he paying you child support?

13:16 20    A   That's a contested issue at this point.

13:16 21    Q   Do you have --

13:16 22    A   It is not in accordance with the

13:16 23 temporary time-share order as ordered by the

13:16 24 family court.

13:16 25    Q   Do you have a pending legal matter in

FIRST COAST COURT REPORTERS

15

13:16 1 that regard?

13:16 2    A   Yes, sir, we do.

13:16 3    Q   Have you filed a motion to hold him in

13:16 4 contempt or --

13:16 5    A   No, sir.  I was told by that attorney

13:16 6 that all issues were set for trial, and that the

13:16 7 Judge was not accepting any additional motions to

13:16 8 be heard prior to trial.

13:16 9    Q   When is that trial?

13:16 10    A   It is scheduled for mid-April.  I've

13:16 11 been told keep two weeks open on my calendar at

13:17 12 this point.

13:17 13    Q   Who is the judge?

13:17 14    A   Boyer.

13:17 15    Q   And who's your lawyer on that case?

13:17 16    A   Jonathan Zisser.

13:17 17    Q   When you said that officers trampled on

13:17 18 your civil rights, what did the officers do to

13:17 19 trample on your civil rights, other than Collier?

13:17 20    A   They looked at personal information.

13:17 21 They looked at me for personal use and intent

13:17 22 with law enforcement databases, merely for

13:17 23 curiosity, because they wanted to check me out.

13:17 24        And of that information they had access

13:17 25 to my name, my date of birth, my home address, my

FIRST COAST COURT REPORTERS

16

13:17 1 photo ID.  And I had done nothing to solicit this

13:17 2 type of behavior from a law enforcement official

13:17 3 in an official capacity.

13:17 4    Q   Did any of the officers, not counting

13:18 5 Sergeant Collier, actually ever speak to you

13:18 6 about anything?

13:18 7    A   What time frame are you asking about?

13:18 8    Q   Well, do you know any of the other

13:18 9 defendants that you've sued other than Sergeant

13:18 10 Collier?

13:18 11    A   Officer Vercruysse.

13:18 12    Q   How do you know him?

13:18 13    A   He worked directly for Sergeant Collier

13:18 14 at the time that Sergeant Collier and I were in

13:18 15 our relationship.

13:18 16    Q   And so did you have social contact with

13:18 17 him?

13:18 18    A   We did.

13:18 19    Q   But what about the other officers?

13:18 20    A   It's my understanding that I've worked

13:18 21 around them at different points in my career, but

13:18 22 honestly, I couldn't pick them out of a line-up

13:18 23 if you asked me to.

13:18 24    Q   So you don't actually know Officer

13:18 25 Dehling or Spencer or Knowles or Voutour; is that

FIRST COAST COURT REPORTERS

**17**

13:18 1  right?

13:18 2      A  I've probably met them.  Do I know them

13:18 3  on a personal basis?  No.  Do I know them passing

13:18 4  in a work atmosphere?  I'd probably recognize

13:18 5  them if I've been in contact with them before.

13:19 6      Q  Now, to your knowledge, did Officers

13:19 7  Dehling, Spencer, Knowles, Voutour, do anything

13:19 8  to you with respect to your civil rights other

13:19 9  than access the information that you referred to?

13:19 10      A  Not that I'm aware of.

13:19 11      Q  And so, just so you understand what I'm

13:19 12  saying, Officer Dehling has never, to your

13:19 13  knowledge, done anything to you personally to

13:19 14  stalk you or to --

13:19 15      A  I don't know.

13:19 16      Q  -- throw anything on your lawn or -- do

13:19 17  you see what I'm getting at?

13:19 18      A  I don't know.  I don't know what these

13:19 19  officers have done in a work respect.  I don't

13:19 20  know if they've come by fire stations; I don't

13:19 21  know if they also have traveled outside of the

13:20 22  county; I don't know if they've followed me; I

13:20 23  don't know if they -- I don't know.  I don't

13:20 24  trust anybody that wears that uniform.

13:20 25      Q  All right.  But when you say you don't

**18**

13:20 1  know, can you tell me anything at all about

13:20 2  Officer Dehling's activities with respect to you

13:20 3  other than that it is your belief that he

13:20 4  accessed your information?

13:20 5      A  It's not my belief; it's been verified

13:20 6  and sustained by the Florida Department of Law

13:20 7  Enforcement.  Do I know that he's done anything

13:20 8  with my personal information?

13:20 9      Q  Well, it is, in fact, also your belief

13:20 10  that that's true; right?

13:20 11      A  I have no reason to think the Florida

13:20 12  Department of Law Enforcement would unjust- -- or

13:20 13  they would have no reason to damage their own

13:20 14  credibility by lying.

13:20 15      Q  And was there anything about my question

13:20 16  that suggested to you that I didn't believe it?

13:20 17      A  I didn't like the tone in which you were

13:20 18  inferring that it was my belief.  It's been

13:20 19  sustained.

13:20 20      Q  Well, how about if we can just maybe

13:20 21  start all over here, because I'm trying to be as

      22  polite to you as I possibly can.  And I'm not

13:21 23  here to be hostile to you or to put words in your

13:21 24  mouth or to be unpleasant.  And it is obvious to

13:21 25  me that your tone is hostile.

**19**

13:21 1      And perhaps we should take a break and

13:21 2  maybe you could gather yourself, because if you

13:21 3  want to make this unpleasant, you can.

13:21 4      Do you need a break?

13:21 5      A  No.  I'm good.

13:21 6      Q  All right.  Then how about if you just

13:21 7  answer my questions?

13:21 8      A  I don't understand what you were asking.

13:21 9      Q  Other than accessing your information,

13:21 10  do you have any information at all to suggest

13:21 11  that Officer Dehling did anything to you?

13:21 12      A  No.

13:21 13      Q  Other than accessing your information,

13:21 14  do you have any information that Officer Knowles

13:21 15  did anything to you?

13:21 16      A  No.

13:21 17      Q  Other than accessing your information,

13:21 18  did Officer Voutour do anything to you to your

13:21 19  knowledge?

13:21 20      A  No.

13:21 21      Q  Other than accessing your information,

13:21 22  did Officer Spencer do anything to you?

13:22 23      A  No.

13:22 24      Q  Other than accessing your information,

13:22 25  do you have any reason to believe Officer

**20**

13:22 1  Vercruysse did anything to you?

13:22 2      A  No.

13:22 3      Q  Now, with respect to Collier, as I

13:22 4  understand it, you've complained about other

13:22 5  activities other than accessing your information;

13:22 6  is that correct?

13:22 7      A  Yes.

13:22 8      Q  First of all, did you ever ask Sergeant

13:22 9  Collier to run your information?

13:22 10      A  No.

13:22 11      Q  In the investigation it appears that he

13:22 12  has claimed that you may or may not -- may have

13:22 13  asked him to do that.  Do you have any

13:22 14  recollection in that regard?

13:22 15      A  I would have no reason for Sergeant

13:22 16  Collier to pull my information.  I am more than

13:22 17  capable of pulling that information on my own.

13:22 18      Q  And the information you're referring to

13:23 19  is --

13:23 20      A  My driver's license, my --

13:23 21      Q  -- your driver's license information?

13:23 22      A  Any of the information that he accessed

13:23 23  I'm capable of getting on my own.

13:23 24      Q  And the information that you're

13:23 25  referring to is actually on your driver's

21

13:23 1 license?

13:23 2    A   My driver's license, my tag, my credit

13:23 3 report, my social security number, my next of kin

13:23 4 for emergency contact, my photo ID, everything.

13:23 5    Q   Of the things that you mentioned, what's

13:23 6 on your driver's license?

13:23 7    A   Everything except for my social --

13:23 8 excuse me -- my social security number.

13:23 9    Q   Do you use your driver's license for any

13:23 10 purpose other than keeping it in your wallet so

13:23 11 that -- in case you get pulled over?

13:23 12    A   I'm not sure what you're asking.

13:23 13    Q   Do you ever show your driver's license

13:23 14 as ID in order to gain admittance to places, or

13:23 15 to pass a check or --

13:23 16    A   I don't write checks; I use a check

13:23 17 card. So, no. And, no, I don't generally go

13:23 18 places that I need to present ID to get in the

13:24 19 door.

13:24 20    Q   Well, do you get carded by Target if you

13:24 21 were to buy a bottle of wine or something?

13:24 22    A   I have been in the past.

13:24 23    Q   So you've used your driver's license to

13:24 24 show to people if they ask you?

13:24 25    A   If they've asked, yes.

FIRST COAST COURT REPORTERS

22

13:24 1    Q   Now, how did you learn that Officers

13:24 2 Dehling, Spencer, Knowles, Vercruysse and Voutour

13:24 3 accessed your DAVID information?

13:24 4    A   Sergeant Collier told me in one of the

13:24 5 multiple attempts that summer to reconcile the

13:24 6 relationship. He made a comment in passing

13:24 7 about, Yeah, I've got a bunch of guys at work

13:24 8 pissed off at me now. And I said, Really? Why

13:24 9 is that? He said, They all got pulled down to

13:24 10 Internal Affairs as well because their names

13:24 11 showed up on your DAVID report.

13:24 12    Q   So if I understand what you're saying,

13:24 13 you did not learn about what the other officers

13:24 14 had done because of your efforts to check with

13:25 15 the State of Florida yourself. You learned about

13:25 16 it because Sergeant Collier told you that these

13:25 17 other officers had gotten in trouble for

13:25 18 accessing your information.

13:25 19    A   I had no reason to think that I needed

13:25 20 to check my information. So, no, I had not at

13:25 21 that point.

13:25 22    Q   Well, just to make sure the record is

13:25 23 clear, it's your understanding then that the

13:25 24 Jacksonville Sheriff's Office actually learned

13:25 25 about them accessing your information before you

FIRST COAST COURT REPORTERS

23

13:25 1 did.

13:25 2    A   Correct.

13:25 3    Q   And they had actually already taken

13:25 4 corrective action before you learned about it.

13:25 5    A   I don't believe it was corrective, but

13:25 6 they did take action.

13:25 7    Q   Well, what is the action that you

13:25 8 understood that they took?

13:25 9    A   My ungarnished opinion, sweep it under

13:25 10 the rug.

13:25 11    Q   Well, Sergeant Collier characterized it

13:26 12 as them getting in trouble, if I understood your

13:26 13 testimony; is that right?

13:26 14    A   No. I believe Sergeant Collier

13:26 15 indicated to me that they were pissed because

13:26 16 they had been pulled into Internal Affairs to

13:26 17 begin with.

13:26 18    Q   Had you had, at that point, any

13:26 19 intention to ever check your information to see

13:26 20 who had accessed it?

13:26 21    A   Personally, no. I had been led to

13:26 22 believe by the Internal Affairs Department that

13:26 23 they had already run my information and there was

13:26 24 nothing there for me to be concerned of. And

13:26 25 that was based on all of the problems I had had

FIRST COAST COURT REPORTERS

24

13:26 1 with Collier up to that point.

13:26 2    Q   Well, I understand that the relationship

13:26 3 between you and Sergeant Collier is contentious,

13:26 4 but I'm going to let his lawyer ask you about

13:26 5 him.

13:26 6    A   Okay.

13:27 7    Q   Did you discuss with Sergeant Collier

13:27 8 why these officers had looked you up on DAVID?

13:27 9    A   He indicated that he had -- that the

13:27 10 other officers had told him that it was a result

13:27 11 of my name being in the news.

13:27 12    Q   And why was your name in the news?

13:27 13    A   Participation in a charity event.

13:27 14    Q   And what did the news report say about

13:27 15 you?

13:27 16    A   They didn't say anything about me

13:27 17 specifically.

13:27 18    Q   Well, what was it about the charity

13:27 19 event that caught their attention?

13:27 20    MR. DeMAGGIO: Object to form.

13:27 21 Go ahead.

13:27 22    MR. PHILLIPS: Well -- all right. I can

13:27 23 rephrase it.

13:27 24 BY MR. PHILLIPS:

13:27 25    Q   What did Sergeant Collier indicate to

FIRST COAST COURT REPORTERS

25

13:27 1 you was the reason why their attention was
13:28 2 caught.
13:28 3     **A  Sergeant Collier didn't indicate to me**
    4 **why they had done what they had done.**
13:28 5     Q  Well, when he told you that they had
13:28 6 looked you up because of a news report, what was
13:28 7 the news report about?
13:28 8     **A  Sergeant Collier did not tell me that's**
13:28 9 **why they looked me up.**
13:28 10     Q  Well, then -- all right.  Let me back up
13:28 11 again, because I thought I understood you to say
13:28 12 that that was -- just that.  So obviously I've
13:28 13 misunderstood.
13:28 14     When you had this conversation with
13:28 15 Sergeant Collier, please tell us everything you
13:28 16 can remember about what he said and what you
13:28 17 said.
13:28 18     **A  Sergeant Collier said there were several**
13:28 19 **other police officers that were pissed for being**
13:28 20 **pulled into Internal Affairs.  He did not**
13:28 21 **elaborate why they had been pulled into Internal**
13:28 22 **Affairs.  He did not elaborate who they were.  He**
13:28 23 **didn't elaborate what their punishment was going**
13:28 24 **to be.**
13:28 25     **The blanket statement was, There's**

26

13:28 1 **several other police officers that are pissed**
13:28 2 **about having to go down to IA.**
13:28 3     **I turned around and called Internal**
13:29 4 **Affairs, and I asked to speak with a sergeant.**
13:29 5 **And I spoke with Sergeant Smith and she said,**
13:29 6 **Yes, ma'am, we did run your information after**
13:29 7 **everything else that Sergeant Collier had done,**
13:29 8 **and there are several other officers who have**
13:29 9 **also accessed your information.**
13:29 10     **And Sergeant Smith provide me the list**
13:29 11 **of the other names.  She also provided me the**
13:29 12 **dates that they had pulled my information.**
13:29 13     **She, in turn, told me she believed that**
13:29 14 **it was pulled because of my name being in the**
13:29 15 **news.**
13:29 16     Q  So Sergeant Collier didn't mention the
13:29 17 news story.  It was Sergeant Smith that mentioned
13:29 18 the news story.
13:29 19     **A  Correct.**
13:29 20     Q  Did you ever ask Sergeant Collier about
13:29 21 that?
13:29 22     **A  About what?**
13:29 23     Q  The news story angle of why they looked
13:29 24 you up?
13:29 25     **A  No.**

27

13:29 1     Q  During the course of your efforts to
13:29 2 reconcile with Sergeant Collier, did you ever
13:29 3 discuss the issue with respect to your name being
13:29 4 accessed?
13:29 5     **A  I was not aware of it until I had**
13:30 6 **completely cut ties and told him there was no**
13:30 7 **chance of a reconciliation.  This was months**
13:30 8 **after the fact.**
13:30 9     Q  Do you have any opinion about why he
13:30 10 would tell you that the other officers were mad
13:30 11 at him?
13:30 12     **A  I'm not going to speculate as to why he**
13:30 13 **thinks what he does.  I don't know.**
13:30 14     Q  Well, tell me everything you can
13:30 15 remember about that conversation, please.
13:30 16     **A  Which conversation?**
13:30 17     Q  The one where he disclosed to you that
13:30 18 officers were angry with him.
13:30 19     **A  He said they were pissed because they**
13:30 20 **got pulled down to Internal Affairs.**
13:30 21     Q  Okay.  What else did y'all talk about
13:30 22 during that conversation --
13:30 23     **A  I don't remember.**
13:30 24     Q  -- if anything?
13:30 25     **A  At that point in our relationship, I had**

28

13:30 1 **completely separated work from personal.  Nothing**
13:30 2 **from my job or his job was discussed, period.  It**
13:30 3 **was keep work work and keep home home.**
13:30 4     Q  What was the purpose of having the
13:30 5 conversation with him?
13:30 6     **A  He brought it up.  I don't know.**
13:30 7     Q  Did you call him or did he call you?
13:31 8     **A  I don't remember.  This is a year and a**
13:31 9 **half ago.**
13:31 10     Q  Was it in person or on the phone?
13:31 11     **A  I believe it was in person.**
13:31 12     Q  Were there other subjects discussed
13:31 13 during this conversation?
13:31 14     **A  I don't remember.**
13:31 15     Q  How long was the conversation?
13:31 16     **A  The blurb about there were other**
13:31 17 **officers being pissed, probably less than 30**
13:31 18 **seconds.**
13:31 19     Q  How long was the conversation in total?
13:31 20     **A  I don't remember.**
13:31 21     Q  Do you think it was longer than five
13:31 22 minutes?
13:31 23     **A  I don't know.**
13:31 24     Q  You have no idea?
13:31 25     **A  I have no idea.**

29

13:31 1    Q  So you couldn't tell us --

13:31 2    A  The only part of that that stuck with me

13:31 3  was the fact that other officers were upset, and

13:31 4  it triggered me the next business day to call

13:31 5  Internal Affairs to find out what else was going

13:31 6  on with my name.

13:31 7    Q  So you couldn't tell us at this point

13:31 8  whether the conversation was one minute or two

13:31 9  hours?

13:31 10    A  No.

13:31 11    Q  It could have been three hours?

13:31 12    A  I don't know.

13:31 13    Q  Four hours?

13:31 14    A  I don't know.

13:31 15    Q  Really?  You have no idea if you talked

13:32 16  to him for four hours or more?

13:32 17    A  No.  People that were dating and living

13:32 18  together typically talk for up to 18 hours a day,

13:32 19  and it's not anything unremarkable.  I don't

13:32 20  recall.

13:32 21    Q  I thought I understood you to say that

13:32 22  this conversation occurred after you had cut all

13:32 23  ties with him.

13:32 24    A  That doesn't mean he wasn't still trying

13:32 25  to reconcile.  He was trying to reconcile all the

FIRST COAST COURT REPORTERS

30

13:32 1  way through to December of that year.

13:32 2    Q  Do you remember anything else about that

13:32 3  conversation whatsoever?

13:32 4    A  No.

13:32 5    Excuse me.  Let me back up.  I do

13:32 6  remember that I emailed Sergeant Smith the next

13:32 7  day and told her that I had been notified by

13:32 8  Sergeant Collier.  And I asked what the details

13:32 9  of these other officers having access to my

13:32 10  information was, what the purpose was, and she

13:32 11  called me back very shortly thereafter and I had

13:32 12  a conversation with her.  But it was nothing in

13:32 13  depth with Sergeant Collier.

13:32 14    Q  Is that when you learned that Sergeant

13:32 15  Collier had accessed your information?

13:32 16    A  No.  Sergeant Smith had already told me

13:33 17  that they had verified that he had pulled my

13:33 18  information prior to that.

13:33 19    Q  How did you learn that Sergeant Collier

13:33 20  had run your information?

13:33 21    A  Sergeant Collier filed a complaint

13:33 22  against my job -- or against me with the City of

13:33 23  Jacksonville through City H/R.  And it was sent

13:33 24  to City H/R because Sergeant Collier felt that

13:33 25  the fire department was going to try and cover

FIRST COAST COURT REPORTERS

31

13:33 1  for me.

13:33 2    He took a complaint directly to Mary

13:33 3  Anne Evans.  Mary Anne Evans then called me and

13:33 4  said, Lieutenant Buckner, I need to speak with

13:33 5  you.  And it was, We need to find out, have you

13:33 6  been driving around with a suspended driver's

13:33 7  license?  Have you been doing this on duty?  Have

13:33 8  you been driving around with your child in your

13:33 9  personal vehicle on duty?

13:33 10    She said she had been contacted by

13:33 11  Sergeant Collier with this complaint.

13:33 12    He had also complained that I had

13:33 13  accessed a medical record that I had no right

13:33 14  being in.

13:33 15    She asked me to give her a written

13:33 16  statement.  I gave her a written statement, I

13:33 17  believe, the next day.

13:33 18    When she told me that the basis of the

13:33 19  complaint was driving with a suspended driver's

13:33 20  license, I said, I've never had a suspended

13:34 21  driver's license.  And I asked her, Do you need

13:34 22  me to get proof of this?  And she said, Any proof

13:34 23  you would have to shut this complaint down,

13:34 24  because she was tired of dealing with the sniping

13:34 25  back and forth.  And I said, Absolutely.

FIRST COAST COURT REPORTERS

32

13:34 1    So I went to the Duval County Clerk of

13:34 2  the Courts and then I also went to the Clay

13:34 3  County Clerk of the Courts, and I had both of

13:34 4  them pull my complete driving history, and

13:34 5  neither one ever showed a suspension.  And I took

13:34 6  that back to Ms. Evans and Ms. Evans said, Thank

13:34 7  you very much.

13:34 8    From there I went to Internal Affairs

13:34 9  and said, He needs to stop filing false

13:34 10  complaints.

13:34 11    Q  Before the complaint about your

13:34 12  allegedly suspended driver's license, had you

13:34 13  filed any complaints with JSO about Sergeant

13:34 14  Collier?

13:34 15    A  There have been multiple complaints and,

13:34 16  yes, there were some before that.

13:34 17    Q  What was the first complaint that you

13:34 18  made to the department about Sergeant Collier?

13:34 19    A  Sergeant Collier being on duty with JSO

13:35 20  and driving to Green Cove five separate times on

13:35 21  two separate dates and accessing my home after

13:35 22  11:00 p.m. without being given permission.

13:35 23    Q  And do you know how that was resolved?

13:35 24    A  I'm not -- are we talking from an

13:35 25  integrity standpoint?  Are we talking about from

FIRST COAST COURT REPORTERS

33

13:35 1  an Internal Affairs' standpoint?  Are we talking
13:35 2  about from a family law standpoint?  There's
13:35 3  several aspects here.  I don't understand which
13:35 4  one you're after.
13:35 5     Q  All three.
13:35 6     A  Okay.
13:35 7     Q  You can pick the order.
13:35 8     A  Okay.  Integrity dismissed the case
13:35 9  because I asked them not to file criminal
13:35 10  charges, at the advice of my family attorney at
13:35 11  the time, who was Sharon Johnson.  Sharon told me
13:35 12  that it was in my best interest to try and
13:35 13  resolve it between the two of us and for it to
13:35 14  not cost Sergeant Collier his job.
13:35 15         So I took a step back and I asked
13:35 16  Integrity to not pursue the criminal aspect.
13:35 17         It was then taken to Internal Affairs.
13:35 18  Internal Affairs sustained that Sergeant Collier
13:35 19  had done wrong, and I believe he was given a
13:36 20  level one reprimand which, in layman's terms,
13:36 21  means nothing.
13:36 22         From a family law standpoint, he was
13:36 23  admonished by the Judge to stay off of my
13:36 24  property and not to come back.
13:36 25     Q  A level one written reprimand is a

34

13:36 1  formal discipline in the police department, is it
13:36 2  not?
13:36 3     A  I believe so.
13:36 4     Q  And, in fact, can be a part of
13:36 5  progressive discipline so that it can result in
13:36 6  harsher consequences down the road if subsequent
13:36 7  misconduct occurs.  Is that not true?
13:36 8     A  I don't know JSO's disciplinary matrix,
13:36 9  so I can't answer that.
13:36 10     Q  Would it surprise you to know that it's
13:36 11  pretty similar to the one at the fire department?
13:36 12     A  I don't have anything by the name of
13:36 13  level one, so I can't compare.  I'm unfamiliar.
13:36 14     Q  What did the news report that concerned
13:37 15  your time at Whiskey River have to say?
13:37 16     A  About me or about the event or about the
13:37 17  behavior?
13:37 18     Q  All three.
13:37 19     A  It listed my name.  It did not give any
13:37 20  specifics of anything I had done or not done.
13:37 21         In general, it reported topless
13:37 22  firefighters, which was true in six out of seven
13:37 23  of the cases, and conduct unbecoming.
13:37 24     Q  Were the firefighters female or male or
13:37 25  both?

35

13:37 1     A  Both.
13:37 2     Q  And was there anything in the news story
13:38 3  that suggested that you were one of the topless
13:38 4  firefighters?
13:38 5     A  It didn't identify who had their top on
13:38 6  and who did not.
13:38 7     Q  Under what circumstances would these
13:38 8  firefighters have been topless?
13:38 9     A  I'm not understanding the question.
13:38 10     Q  Well, I wasn't there.  So why don't you
13:38 11  tell me about what was going on at the event and
13:38 12  why there would be firefighters there with no
13:38 13  shirts on.
13:38 14     A  Firefighters running around in charity
13:38 15  calendar attire or apparel.  They typically run
13:38 16  around -- the guys will run around in their
13:38 17  bunker pants and suspenders and no shirt.
13:38 18     Q  Were there any women there with no
13:38 19  shirt?
13:38 20     A  There was one female there who did not
13:38 21  wear a shirt, but she taped her suspenders over
13:38 22  her nipples.  And it was my understanding, from
13:38 23  her commentary, that it was so that it was not
13:38 24  pornographic.
13:38 25     Q  Do you have any idea who that person

36

13:38 1  was?
13:38 2     A  Who which person was?
13:39 3     Q  The female that you're referring to.
13:39 4     A  I do.
13:39 5     Q  Who was it?
13:39 6     A  Lieutenant Yasuko Kabisch.
13:39 7     Q  How were you dressed at this event?
13:39 8     A  I had my bunker pants on and a bathing
13:39 9  suit top.
13:39 10     Q  And what kind of bathing suit top was
13:39 11  it?
13:39 12     A  A bathing suit top.  It's yellow.
13:39 13     Q  Well, when you mean bathing suit, that
13:39 14  can mean one-piece, bikini --
13:39 15     A  Two-piece.
13:39 16     Q  So it was the top part of a bikini and
13:39 17  your bunker pants?
13:39 18     A  My personal bunker pants, yes.
13:39 19     Q  And nothing else?
13:39 20     A  Well, I had clothing on under my bunker
13:39 21  pants.
13:39 22     Q  I'm sorry.  That was unclear.
13:39 23         Did you have anything on above the waist
13:39 24  other than your bikini top?
13:39 25     A  No.

37

13:39 1    Q   Are there photographs of that?
13:39 2    A   Yes.
13:39 3    Q   Do you have them?
13:39 4    A   No.
13:39 5    Q   Do you know who does?
13:39 6    A   They're on the Internet, so anybody at
13:39 7 this point.
13:39 8    Q   And is it your understanding that the
13:40 9 access of your information took place by these
13:40 10 officers after that Whiskey River event?
13:40 11   A   That is my understanding.
13:40 12   Q   What was the occasion of the
13:40 13 firefighters in partial undress at the event?
13:40 14   A   It was a charity date auction for a
13:40 15 firefighter who had been killed off duty, to
13:40 16 benefit his wife who was an unemployed single
13:40 17 mother at this point with three small children.
13:40 18   Q   So were the firefighters who were partly
13:40 19 dressed being auctioned off for dates?
13:40 20   A   Yes.
13:40 21   Q   And were you one of those?
13:40 22   A   Yes.
13:40 23   Q   Did Sergeant Collier speak to you about
13:40 24 that?
13:40 25   A   I don't understand the question.

38

13:40 1    Q   Did Sergeant Collier ever discuss with
13:40 2 you your participation in that event?
13:40 3    A   He did.
13:40 4    Q   Was this on more than one occasion or
13:41 5 only one?
13:41 6    A   It's still ongoing today.
13:41 7    Q   Could you summarize for us what the
13:41 8 tenor of the discussion has been in that regard?
13:41 9    A   His basic opinion was he was completely
13:41 10 astounded that I had participated in that type of
13:41 11 event, because it's not something I would have
13:41 12 normally done, and he could not believe that I
13:41 13 had done that in such a public venue.
13:41 14   Q   So he wasn't happy that you did that.
13:41 15   A   I can't characterize it as not happy.  I
13:41 16 think it was more just absolutely shocked.  I
13:41 17 don't think anger or hostility or any other
13:41 18 emotion was ever really identified.
13:41 19   Q   Now, did this Whiskey River event take
13:41 20 place before you cut all ties with him in your
13:41 21 relationship?
13:41 22   A   Before the final time I cut all ties?
13:41 23 Yes.
13:41 24   Q   Well, let me ask you this, I guess, so
13:41 25 we can get a timeline.

39

13:41 1    A   Okay.
13:41 2    Q   When did you first meet Sergeant
13:42 3 Collier?
13:42 4    A   And I'm not trying to be difficult.  I'm
13:42 5 backtracking in my own mind.
13:42 6        We started dating in 2010.  I had been
13:42 7 on the job for five years at that point.  So
13:42 8 sometime early 2008 we had worked in the same
13:42 9 area in Grand Park together.  We had run into
13:42 10 each other several times, but we didn't have a
13:42 11 personal relationship.  It was just working
13:42 12 acquaintances.
13:42 13   Q   When did you first get into a personal
13:42 14 relationship with Sergeant Collier?
13:42 15   A   We started working in more close
13:42 16 proximity in late 2009 in the Emergency
13:42 17 Management Division of the fire department,
13:42 18 working on the missing child -- I don't know what
13:42 19 it's categorized now, but basically the operating
13:42 20 procedures for all of the major agencies in Duval
13:42 21 County, whether it was the fire department, JSO,
13:42 22 emergency management, having to pull in multiple
13:42 23 resources.
13:42 24       We were working on developing that plan.
13:42 25 And it was shortly after Somer Thompson, Malia

40

13:43 1 (phonetic), Haleigh Cummings, all those little
13:43 2 girls started going missing in North Florida.
13:43 3 There was not a cohesive plan in place, and
13:43 4 that's what we were working on.
13:43 5    Q   And at some point you started dating?
13:43 6    A   Correct.
13:43 7    Q   What is the birth date of -- well, just
13:43 8 the birth month and year of your child?
13:43 9    A   It's March of 2011.
13:43 10   Q   And at what point did you first break up
13:43 11 with Sergeant Collier?
13:43 12   A   I'm not understanding -- that can be
13:43 13 taken several ways.  I'm not understanding what
13:43 14 you mean.
13:43 15   Q   All right.  Well, I guess that's fair
13:43 16 enough, because I didn't -- you've indicated that
13:43 17 your relationship with Sergeant Collier has been
13:43 18 on again, off again, for lack of a better way of
13:43 19 characterizing that.
13:43 20   A   It was on again, off again until late
13:43 21 2012.  Late 2012, yes.
13:44 22   Q   But at the time your child was born in
13:44 23 March of 2011, had it been on and off -- on
13:44 24 again, off again before that, or was it still on
13:44 25 at that point?

41

13:44 1    A  It was on at the point that we had our
13:44 2  son.  During the pregnancy, there were several
13:44 3  issues that came into play.  There were several
13:44 4  times that either one of us said we were going to
13:44 5  end the relationship and we decided, for the sake
13:44 6  of the baby, to try again.
13:44 7    Q  And --
13:44 8    A  I'm sorry.  Let me back up, because I
13:44 9  misstated a date.  It was through the end of
13:44 10  2011, not through the end of 2012, that it was on
13:44 11  again, off again.
13:44 12    Q  So this charity event, was this before
13:44 13  or after the birth of your son?
13:44 14    A  After.
13:44 15    Q  How long after?
13:44 16    A  Fifteen months.
13:44 17    Q  And in the ensuing 15 months, did your
13:45 18  relationship then continue to be on and off
13:45 19  again?
13:45 20    A  No.
13:45 21    Q  Were you --
13:45 22    A  I'm sorry.  The ensuing as in?
13:45 23    Q  In between the birth of your son and the
13:45 24  charity event, how did your relationship go with
13:45 25  Sergeant Collier?

42

13:45 1    A  There were several minor attempts at
13:45 2  reconciliation, but it was apparent on both sides
13:45 3  we were trying only for the child.  And at that
13:45 4  point, two adults, it's not going to work, cut
13:45 5  ties, move on.
13:45 6    Q  So had you already completely broken
13:45 7  ties off as an intimate relationship with
13:45 8  Sergeant Collier --
13:45 9    A  Yes.
13:45 10    Q  -- at the time the charity event
13:45 11  occurred?
13:45 12    A  Yes.
13:45 13    Q  So would it be fair to say that at that
13:45 14  point then that you felt his opinion about what
13:45 15  you did at the charity event was pretty much none
13:45 16  of his business?
13:45 17    A  That's exactly how I felt about it.
13:46 18    Q  Did you express that view to him?
13:46 19    A  I've expressed that view to him on
13:46 20  multiple topics, yes.
13:46 21    Q  Did he ever tell you that any of the
13:46 22  other officers had accessed your information
13:46 23  because of the charity event?
13:46 24    A  He did not tell me why they did what
13:46 25  they did.

43

13:46 1    Q  So he's never actually told you anything
13:46 2  about why they did that?
13:46 3    A  No.  I got that information from
13:46 4  Sergeant Smith.
13:46 5    Q  And so Sergeant Smith told you that --
13:46 6  did she tell you that she suspected that's why
13:46 7  they did it?
13:46 8    A  She speculated that that was their
13:46 9  justification, but I don't think she ever gave a
13:46 10  definitive reason one way or the other.
13:46 11    Q  And you have never actually spoken with
13:46 12  any of these other officers about this subject?
13:46 13    A  Absolutely not.
13:46 14    Q  So none of them have told you why they
13:47 15  did what they did?
13:47 16    A  No.
13:47 17    Q  Do you have any information about why
13:47 18  they did what they did, other than that which was
13:47 19  provided to you by either the department or in
13:47 20  discovery during this lawsuit?
13:47 21    A  I'm not understanding what you're
13:47 22  asking.
13:47 23    Q  Do you have any other sources of
13:47 24  information about why they did it, other than
13:47 25  what JSO's told you, in essence?

44

13:47 1    A  JSO as in Sergeant Smith?  No.  JSO as
13:47 2  in scuttlebutt around the guys that I have to
13:47 3  work around, patrol officers and whatnot that I
13:47 4  work around in the field, the general consensus
13:47 5  is they're a bunch of horny bastards running
13:47 6  around and they thought it was their right to
13:47 7  look.
13:47 8    Q  Could you tell us any names of anybody
13:47 9  who has said that?
13:47 10    A  No.  I could probably go back and think
13:47 11  about it and figure out who -- in the context of
13:48 12  date, but sitting here, no, I don't know.
13:48 13    Q  Would it be fair to characterize that
13:48 14  what they said was speculation?
13:48 15    A  I believe it was their personal
13:48 16  viewpoint of the situation.
13:48 17    Q  Did anybody ever tell you, I have spoken
13:48 18  with either Dehling or Spencer and Knowles or
13:48 19  Vercruysse or Voutour and this is what they've
13:48 20  told me?
13:48 21    A  No.  I don't want that close of a
13:48 22  contact with any of those officers.
13:48 23    Q  As a result of learning that these
13:48 24  officers had accessed your information, did you
13:48 25  seek any sort of mental health or emotional

45

13:48 1 health treatment?

13:48 2     A  I did speak with EAP a few times in

13:48 3 reference to just general stressors, but I cut

13:48 4 ties with that because, honestly, I don't trust

13:48 5 anything associated with the city at this point.

13:48 6 And as far as seeking licensed mental health, no.

13:49 7     Q  When you say that you spoke with an EAP

13:49 8 counselor for a few times, can you be more

13:49 9 specific?

13:49 10     A  I don't understand what you're asking.

13:49 11     Q  Well, how many is a few?

13:49 12     A  I would say less than five, because

13:49 13 that's all that's initially covered under the EAP

13:49 14 benefits.

13:49 15     Q  I got the impression, from what you

13:49 16 said, that you could have gone back for more.  Is

13:49 17 that fair?

13:49 18     A  If you're creative in your reasons for

13:49 19 going back to EAP, it's unlimited.  I choose not

13:49 20 to be deceptive and try and abuse the system.

13:49 21     Q  So you think that it was less than five

13:49 22 visits?

13:49 23     A  I believe so.  And it wasn't even

13:49 24 visits.  They were phone calls.

13:49 25     Q  So you actually didn't travel.  You just

46

13:49 1 spoke to somebody on the phone?

13:49 2     A  Correct.

13:49 3     Q  Do you think it was certainly more than

13:49 4 one time?

13:49 5     A  More than one, less than five, yes.

13:50 6     Q  But --

13:50 7     A  I can't quantify one, two, three, four,

13:50 8 or five.

13:50 9     Q  Okay.  So it could have been two or

13:50 10 three or four?

13:50 11     A  Correct.

13:50 12     Q  As a result of the incident, with

13:50 13 respect to your learning about the access of your

13:50 14 information, was any medication prescribed for

13:50 15 you?

13:50 16     A  Medication as far as antidepressant or

13:50 17 anti-anxiety?

13:50 18     Q  For any reason at all.

13:50 19     A  I had previously been on Adderall, a

13:50 20 one-month supply.  Because I wasn't taking it

13:50 21 every day, it was just as needed, would last me

13:50 22 anywhere from 90 to 120 days.  Since that time

13:50 23 I'm consistently taking it every day just to

13:50 24 focus and be able to stay on top of what needs to

13:50 25 be dealt with day to day.

47

13:50 1     Q  Now, Adderall is an amphetamine-type

13:50 2 drug, is it not?

13:50 3     A  Correct.  It's used for ADD or ADHD,

13:50 4 concentration-type issues.

13:50 5     Q  And you were taking that before this

13:51 6 happened?

13:51 7     A  Intermittently.

13:51 8     Q  So you're not taking any medication for

13:51 9 anxiety?

13:51 10     A  No.

13:51 11     Q  Or mental anguish?

13:51 12     A  No.  I can't with my job.

13:51 13     Q  I'm sorry?

13:51 14     A  I can't with my job.

13:51 15     Q  So as a result of them accessing your

13:51 16 information, did you become ill in any way?

13:51 17     A  I don't understand the question.

13:51 18     Q  Well, did you -- is there any -- I'm

13:51 19 trying to ask you about the extent to which

13:51 20 you've been damaged by their accessing of the

13:51 21 information.

13:51 22     A  Okay.

13:51 23     Q  And so far you've been pretty articulate

13:51 24 in articulating that you don't like it that they

13:51 25 did that.

48

13:51 1     A  (Nods head affirmatively.)

13:51 2     Q  And that it upsets you.

13:51 3     A  Uh-huh (affirmative response).

13:51 4     Q  So how much does it upset you?

13:52 5     A  I don't trust anybody that works for the

13:52 6 city within JSO.  I don't trust anybody in a law

13:52 7 enforcement capacity in general now.  I have

13:52 8 friends from other agencies that I don't talk to

13:52 9 anymore because of this.

13:52 10         As far as physical illness, I've lost

13:52 11 probably 20 pounds since this started, just over

13:52 12 stress.  It's not at all uncommon to have

13:52 13 heartburn or just absolute acid reflux to the

13:52 14 point that I want to go eat a handful of Tums.

13:52 15     Q  Well, to the best of your knowledge,

13:52 16 they accessed your information a while back.

13:52 17     A  Correct.

13:52 18     Q  Do you have any reason to believe anyone

13:52 19 is still accessing your information?

13:52 20     A  I don't know.

13:52 21     Q  Have you checked?

13:52 22     A  No, because at this point I'm putting it

13:52 23 in the back of my mind because I don't want to go

13:52 24 nuts if I find out that more people are still

13:52 25 doing it.

49

13:53 1      Now, let me restate something.

13:53 2      I do know that two other officers from

13:53 3 other agencies have also been looked at and

13:53 4 they were -- that they pulled my information.

13:53 5 And when they were questioned -- because I called

13:53 6 those agencies and I said, Why is so-and-so

13:53 7 pulling my information? -- they had justifiable

13:53 8 reasons.

13:53 9      They were running queries with my name

13:53 10 or my date of birth or something that matched my

13:53 11 personal information, and they could show me

13:53 12 where they had pulled dozens of other women that

13:53 13 met my profile, not just me.

13:53 14      And I'll use the Duval County School

13:53 15 Board. They were looking for somebody with the

13:53 16 initials C. C. Buckner that had blond hair, and

13:53 17 one of their officers put in that -- those

13:53 18 parameters, and it pulled my information and I

13:53 19 believe it pulled 40 other women throughout the

13:53 20 state of Florida with the same parameters.

13:53 21      Q   How did you learn about that?

13:53 22      A   That was on the same FDLE report that I

13:53 23 had that indicated these officers had done this.

13:53 24      Q   So as we sit here today, you have no

13:54 25 information that anyone's repeated the behavior?

FIRST COAST COURT REPORTERS

50

13:54 1      A   I have no information either way.

13:54 2      Q   The fact that you have a pending

13:54 3 lawsuit, is that stressful?

13:54 4      A   It's extremely stressful.

13:54 5      Q   And the fact that you have a pending

13:54 6 EEOC complaint, is that also stressful?

13:54 7      A   Not so much.

13:54 8      Q   Well, what was that complaint about?

13:54 9      A   Hostile work environment at a particular

13:54 10 fire station.

13:54 11      Q   And are you still at that fire station?

13:54 12      A   No, I'm not. I've removed myself from

13:54 13 that situation.

13:54 14      Q   Has that situation been resolved to your

13:54 15 satisfaction?

13:54 16      A   No. The behavior is still ongoing when

13:54 17 I have to make contact with those individuals.

13:54 18      Q   So these are people that you work with

13:54 19 at the fire department.

13:54 20      A   Within the department. We're no longer

13:54 21 in the same station.

13:54 22      Q   But they're not officers for the

13:54 23 Jacksonville Sheriff's Office?

13:54 24      A   I'm sorry?

13:54 25      Q   They're not police officers.

FIRST COAST COURT REPORTERS

51

13:55 1      A   Some of them are dual certified. And

13:55 2 the example for that are our SWAT medics.

13:55 3 They're people that work full time for the fire

13:55 4 department, and then they also are, I want to

13:55 5 say, ancillary or -- they're also employed by the

13:55 6 Sheriff's Office for the SWAT team, but they're

13:55 7 under the full-time umbrella of the fire

13:55 8 department. And, yes, I do still have to work

13:55 9 around those individuals.

13:55 10      Q   Do you have any reason to believe that

13:55 11 any of those people accessed your DAVID

13:55 12 information?

13:55 13      A   No. Their quote was -- and I've asked

13:55 14 two of them, in particular, "Hell, no, I'm not

13:55 15 touching your information. I'm not going to IA."

13:55 16      Q   So they expressed to you that it would

13:55 17 be their belief that they would get in trouble if

13:55 18 they were to access your information.

13:55 19      A   One of the quotes was, "It's a

13:55 20 headhunting mission right now and I'm not

13:55 21 offering myself up."

13:55 22      Q   What did the people at the fire station

13:55 23 do to you to create a hostile work environment?

13:56 24      A   The short version: Another lieutenant

13:56 25 was speculating in front of subordinates, with

FIRST COAST COURT REPORTERS

52

13:56 1 one subordinate in question saying, "Hey, man,

13:56 2 how's that piece of pussy," in front of 12 other

13:56 3 people.

13:56 4      And when I went to the battalion chief

13:56 5 who's also at that fire station, he said, "If you

13:56 6 don't like it, you can transfer out. This is

13:56 7 Station 1 and it's been this way for 160 years.

13:56 8 We're not changing because you're here."

13:56 9      Q   The person to whom that comment was

13:56 10 directed, is this somebody you know?

13:56 11      A   Yes.

13:56 12      Q   Who was it?

13:56 13      A   A firefighter at Station 1, Firefighter

13:56 14 Whitlow.

13:56 15      Q   Was it somebody you were dating?

13:56 16      A   No.

13:56 17      Q   Do you have any idea why that question

13:56 18 would have been put to him if you weren't dating

13:56 19 him?

13:56 20      A   Because I'm friends with Firefighter

13:56 21 Whitlow and his wife. At the time we all used to

13:56 22 go out as part of a large social crowd, and we

13:56 23 were all friends. But there was speculation that

13:56 24 Whitlow, quote, stepping out on his then

13:56 25 fiancee, now wife, and the only person they could

FIRST COAST COURT REPORTERS

53

```
13:56  1   make a tie to was me.
13:57  2          Since then, since we are all now at
13:57  3   separate stations, it's very apparent that his
13:57  4   wife and I are friends.  We all still hang out
13:57  5   together.  Speculation has died down now that
13:57  6   we're no longer in the same station.
13:57  7          But while we were there, the other
13:57  8   firefighters and the other lieutenant felt that
13:57  9   it was fair game to speculate and to just make it
13:57 10   an extremely uncomfortable situation for
13:57 11   everybody.
13:57 12      Q   Have you told anyone that you expect to
13:57 13   retire on the proceeds from this lawsuit?
13:57 14      A   No.
13:57 15      Q   Or that the proceeds from this lawsuit
13:57 16   are your retirement?
13:57 17      A   I have my own retirement.  I don't need
13:57 18   a retirement.
13:57 19      Q   So the answer to that would be no?
13:57 20      A   Correct.
13:57 21      Q   You've never told anyone that?
13:57 22      A   I don't believe I have used that phrase,
13:57 23   no.  And, honestly, knowing what the caps are at
13:57 24   the city for something like this, there's not
13:57 25   enough to retire from, if it went to the max.
```

FIRST COAST COURT REPORTERS

54

```
13:58  1      Q   Have you -- let me just ask you it this
13:58  2   way:  So how is the stress at this point at the
13:58  3   fire department just from your job, as we sit
13:58  4   here?
13:58  5      A   As my job duties?  It's not stressful at
13:58  6   all.  It's what I do.
13:58  7      Q   Well, let me rephrase the question.
13:58  8          You mentioned that you are taking more
13:58  9   Adderall now because of stress.
13:58 10      A   Uh-huh (affirmative response).
13:58 11      Q   What else about your life is stressful
13:58 12   other than the fact that you know that your
13:58 13   information was accessed previously?
13:58 14      A   I'm a single mother.  That in itself is
13:58 15   stressful.  But I've been doing that for almost
13:59 16   17 years now, so I'm pretty well acclimated to
13:59 17   that feeling.  I work two jobs because of
13:59 18   financial issues.  That is not anything new.
13:59 19      Q   What is your second job?
13:59 20      A   I work as a registered nurse.
13:59 21      Q   Where?
       22      A   I work for an agency, so I work at
13:59 23   several different facilities.
13:59 24      Q   What's the agency for which you work?
13:59 25      A   Now it's Elite Medical Staffing.
```

FIRST COAST COURT REPORTERS

55

```
13:59  1      Q   Have you worked for that agency less
13:59  2   because of your information being accessed?
13:59  3      A   No, because I don't work in the city of
13:59  4   Jacksonville.  It's a completely separate issue.
13:59  5      Q   Is the knowledge that your information
13:59  6   was accessed by the officers the cause of any
13:59  7   loss of income by you?
13:59  8      A   Yes.
13:59  9      Q   In what way?
13:59 10      A   I no longer work overtime at all,
14:00 11   unless -- it's very, very rare.  Prior to this,
14:00 12   it was -- it was not unheard of to work overtime;
14:00 13   it was not unheard of to work special events; it
14:00 14   was not unheard of to volunteer for special
14:00 15   projects.
14:00 16          Now I do my 24-hour shift and I go home.
14:00 17   I want nothing to do with anything with the city
14:00 18   when I'm off duty.
14:00 19      Q   Your decision not to work overtime for
14:00 20   the city is your choice, is it not?
14:00 21      A   It is my choice, and it's my choice
14:00 22   because it makes me uncomfortable to be there.
14:00 23      Q   But you could work overtime if you
14:00 24   wanted to?
14:00 25      A   I could, but it's not a palatable
```

FIRST COAST COURT REPORTERS

56

```
14:00  1   option.
14:00  2      Q   Please explain to me how the knowledge
14:00  3   that some police officers looked at your
14:00  4   information a long time ago is causing you not to
14:00  5   work overtime?
14:00  6      A   I don't want to be around anybody from
14:00  7   JSO, period.  Work, personal, pleasure, it does
14:00  8   not matter.  I do not want to be around them.
14:01  9          My 24-hour shift at the fire station is
14:01 10   all that I do.  And now I'm at an extremely slow
14:01 11   station so I have very limited contact with JSO.
14:01 12      Q   So the actions taken by these few
14:01 13   officers have caused you to want to withdraw from
14:01 14   all contact with all police officers from JSO?
14:01 15      A   All police officers, period.  I don't
14:01 16   talk to my friends from other agencies now.
14:01 17      Q   Would the fact that you've had a rocky
14:01 18   and unpleasant relationship with a police officer
14:01 19   named Sergeant Collier have affected this opinion
14:01 20   at all?
14:01 21      A   No, because I was friends with those
14:01 22   same individuals from different departments up
14:01 23   until I found out about FDLE's report.  Most of
14:02 24   them think he's bad-shit crazy, and that's their
14:02 25   quote, not mine.
```

FIRST COAST COURT REPORTERS

57

14:02 1    Q   Well, several of -- you've indicated
14:02 2  that several of the other officers with the
14:02 3  department have expressed the view that they
14:02 4  didn't like what these officers did.
14:02 5    A   Correct.
14:02 6    Q   So what is it about that that causes you
14:02 7  to not like them?
14:02 8    A   It's not not liking them; it's not
14:02 9  trusting them.  There are absolutely zero checks
14:02 10 and balances within the Jacksonville Sheriff's
14:02 11 Office to prohibit this type of behavior from
14:02 12 happening again.  It's after the fact discovery.
14:02 13 There's nothing proactive to keep them from doing
14:02 14 it except for their own honor and integrity, and
14:02 15 that's already been demonstrated they can't
14:02 16 maintain.
14:02 17   Q   Well, is that any different than any
14:02 18 police agency anywhere?
14:02 19   A   Hence the reason I don't trust any
14:02 20 police officers.
14:03 21        MR. PHILLIPS:  How about if we take five
14:03 22 minutes.  I think I might be done.
14:03 23        MR. DeMAGGIO:  Absolutely.
14:03 24        (Brief recess.)
14:03 25 BY MR. PHILLIPS:

58

14:09 1    Q   Ms. Buckner, is there any other way in
14:09 2  which you've been damaged by these officers
14:09 3  accessing your information that you haven't
14:09 4  already explained at this deposition?
14:09 5    A   Yes.
14:09 6    Q   Would you please explain every way that
14:09 7  you've been damaged?
14:09 8    A   We can start with the unnecessary
14:09 9  changes in my academic progression.  I had
14:09 10 already enrolled in my bachelor's program, the
14:09 11 nursing through Jacksonville University.
14:09 12        Because of all of this and the inability
14:09 13 to concentrate and the undue stresses that were
14:09 14 put on me by this, I failed two semesters and I
14:09 15 have practically torpedoed my chance of getting
14:09 16 into the grad program that I was aiming for.  Two
14:09 17 semesters' worth of tuition at Jacksonville
14:10 18 University is just over $11,000.  The inability
14:10 19 to work the overtime or the special events; the
14:10 20 undue stresses it's caused on my family,
14:10 21 especially my 16-year-old daughter; having to
14:10 22 deal with my daughter completely not trusting any
14:10 23 police officers now; defamation of character with
14:10 24 friends and family.
14:10 25   Q   All right.  Well, let's talk about

59

14:10 1  those.  When did you stop going to school?
14:10 2    A   I attempted going to school through the
14:10 3  end of May of last year.
14:10 4    Q   Of 2013?
14:10 5    A   Correct.
14:10 6    Q   And to your recollection, when was your
14:10 7  information accessed by these officers?
14:10 8    A   It was accessed, I believe, in August of
14:10 9  2012.  I did not get confirmation on it -- I got
14:10 10 the initial confirmation from JSO in December, I
14:11 11 believe.  And then, going through the bureaucracy
14:11 12 of FDLE and getting them to confirm it and
14:11 13 getting the reports back I don't believe happened
14:11 14 until March-ish of 2013.
14:11 15        So for about two months I tried to keep
14:11 16 going, tried to keep going, and it wasn't
14:11 17 happening.
14:11 18   Q   Well, how do you -- apparently you and
14:11 19 Sergeant Collier were having big problems at the
14:11 20 time; right?
14:11 21   A   Problems caused by this behavior, yes.
14:11 22   Q   How do you separate the stress from
14:11 23 having a child with somebody that you are really
14:11 24 upset with versus the knowledge that five
14:11 25 officers looked at your information for a few

60

14:11 1  seconds?
14:11 2    A   Because my daughter's father and I have
14:11 3  hated each other for almost 17 years, and that
14:11 4  has never impacted my school or work performance.
14:11 5    Q   Was there anything compelling you to
14:12 6  stop going to school?
14:12 7    A   I don't understand the question.
14:12 8    Q   Well, nobody made you stop going to
14:12 9  school; right?
14:12 10   A   My failing grades put me in jeopardy of
14:12 11 being expelled from the program.  So, yes.
14:12 12   Q   And so it's your testimony that the fact
14:12 13 that these officers looked at your information
14:12 14 for a few seconds caused you to fail in your
14:12 15 classes?
14:12 16   A   No.
14:12 17        MR. DeMAGGIO:  Object to form.
14:12 18        Go ahead.
14:12 19   A   No.  It's not the time in question that
14:12 20 they looked at the information.  It's the
14:12 21 invasion of privacy and the fact that they hold
14:12 22 no regards for somebody's civil rights.  That
14:12 23 shakes somebody pretty deeply.  I've done nothing
14:12 24 wrong to justify that type of attention from law
14:12 25 enforcement.

61

14:12 1    Q   You also mentioned defamation among your
14:13 2    family and friends?
14:13 3    A   Correct.
14:13 4    Q   Who has defamed you?
14:13 5    A   Sergeant Collier did with the
14:13 6    information he gleaned from this information.
14:13 7    Q   Well, what did he say about you that
14:13 8    wasn't true?
14:13 9    A   It's not the fact that it's not true.
14:13 10   It's not his business to take personal
14:13 11   information that he gained from a law enforcement
14:13 12   database and broadcast it to people.  It's not
14:13 13   public record.
14:13 14   Q   What information of yours did Sergeant
14:13 15   Collier broadcast to people?
14:13 16   A   Copies of my credit report.
14:13 17   Q   Anything else?
14:13 18   A   Not that I'm aware of.
14:13 19   Q   What information of yours did any of the
14:13 20   other officers broadcast?
14:14 21   A   I don't know of any.
14:14 22   Q   So the defamation that you're referring
14:14 23   to would be all confined to the activities of
14:14 24   Sergeant Collier?
14:14 25   A   Let me revisit the other officers.  And

63

14:15 1    and --
14:15 2    A   Yes, sir.
14:15 3    Q   -- the implications -- integrity, IA,
14:15 4    and family law implications.
14:15 5        What was the next complaint that you
14:15 6    filed on Collier?
14:15 7    A   I'm not trying to be difficult.  I don't
14:15 8    remember the order of succession.  There have
14:15 9    been several.  And it boiled down to making false
14:15 10   statements in family court.
14:15 11   Q   Let's break them down by just the
14:15 12   incident.  The timeline really doesn't matter.  I
14:15 13   just want to know all of them that you filed and
14:15 14   then, consequently, what happened, what the
14:16 15   outcome was.
14:16 16       So what was the second complaint that
14:16 17   you can think of?  And this doesn't need to be in
14:16 18   numerical order.  It's just for purposes of the
14:16 19   record and my notes.
14:16 20   A   There was the fact that he was making
14:16 21   false statements in family court that were
14:16 22   verified by the custody evaluator that I took
14:16 23   proof of back to JSO.  I don't believe anything
14:16 24   ever happened with that.  The fact that he had
14:16 25   accessed -- or that I had had a gate kicked in at

62

14:14 1    I don't know the name of the motion.  Forgive me.
14:14 2    I'm not an attorney.
14:14 3        The last motion that was filed -- and I
14:14 4    believe it was by your counterpart.  I don't know
14:14 5    the other names.  I'm sorry -- basically saying
14:14 6    I'm uncredible, that they can't trust me, that
14:14 7    they don't have faith in me as a professional
14:14 8    based on their interpretation of a news report,
14:14 9    and putting that in a public document, I think
14:14 10   that's pretty defamatory.
14:14 11   Q   Other than a document that exists
14:14 12   because the lawsuit exists, have these officers
14:14 13   ever defamed you?
14:14 14   A   I don't know.
14:15 15       MR. PHILLIPS:  I don't have any other
14:15 16       questions.
14:15 17       CROSS-EXAMINATION
14:15 18   BY MR. VOGELSANG:
14:15 19   Q   I'm just going to pick up -- because he
14:15 20   had stopped -- with regard to Sergeant Collier
14:15 21   and the complaints you've made just on the -- he
14:15 22   stopped at the first one, and I wanted to go
14:15 23   through and ask if there were any others.
14:15 24       So the first that you mentioned was him
14:15 25   going to your house and accessing your home

64

14:16 1    my personal property, which mirrored prior
14:16 2    behavior for which he had been arrested, I took
14:16 3    that back to JSO; nothing happened.  I begged
14:16 4    JSO --
14:16 5    Q   When -- let me get -- when was the gate
14:16 6    kicked in?
14:16 7    A   The night of Whiskey River.
14:16 8    Q   And when was the custody evaluation?
14:16 9    A   The custody evaluation was during 2012
14:17 10   and did not -- it was finalized, I'm speculating,
14:17 11   September, October-ish, maybe November of that
14:17 12   year.
14:17 13       During that course, Sergeant Collier had
14:17 14   accessed my social media; he had accessed my
14:17 15   personal email; he had accessed my work email; he
14:17 16   had accessed multiple different factions of my
14:17 17   personal life.  And I went to JSO with proof of
14:17 18   each one, and I asked repeatedly to make him
14:17 19   stop, make him stop, make him stop.
14:17 20   Q   Then we got to the gate being kicked in
14:17 21   the night of the Whiskey River event.  Anything
14:17 22   else that you can think of?
14:17 23   A   When it was brought to my attention that
14:17 24   he had gone to City H/R and made false
14:17 25   statements, I went back to JSO and took them

65

14:17 1 copies of the email where he had blatantly lied.
14:17 2 And I said, Now, he's -- and I told them it was
14:17 3 retaliatory in nature, that he had gotten in
14:17 4 trouble the first time. He had -- that he was
14:17 5 under the disciplinary umbrella for having been
14:18 6 out of county multiple times, and his version of
14:18 7 getting back at me was to go file a false
14:18 8 complaint with the City H/R.
14:18 9    Q   And nothing happened with that?
14:18 10    A   I believe a written warning. Nothing --
14:18 11    Q   A written reprimand?
14:18 12    A   I don't know. A written something. I
14:18 13 don't know where it fell in progression of the
14:18 14 matrix.
14:18 15    Q   But it's your understanding he was
14:18 16 disciplined for that?
14:18 17    A   I don't know if it was a counseling or a
14:18 18 discipline. I'm not trying to split hairs.
14:18 19    Q   Right.
14:18 20    A   I don't know.
14:18 21    Q   Any other reports?
14:18 22    A   I don't know of any at this point. I've
14:18 23 completely -- I mean, there are plenty that could
14:18 24 have been filed that I haven't because I don't
14:18 25 think JSO is going to do anything.

FIRST COAST COURT REPORTERS

66

14:18 1    Q   Obviously, contentious probably might
14:18 2 not even be a strong enough word, but how would
14:19 3 you characterize that custody battle that you
14:19 4 have with Mr. Collier?
14:19 5    A   To paraphrase you, I don't know that
14:19 6 there's a word for it. There's animosity,
14:19 7 there's contention, there's -- I don't know what
14:19 8 to put it as.
14:19 9    Q   And does that also cause you stress?
14:19 10    A   No. I'm at the point I've accepted
14:19 11 that's who he is and that's how he's going to be,
14:19 12 and I don't let it mess with my day.
14:19 13    Q   In the past would it cause you stress?
14:19 14 Did you let it cause you stress? Or did there
14:19 15 come a time where you stopped letting it bother
14:19 16 you?
14:19 17    A   I stopped letting it bother me.
14:19 18    Q   And about when do you think that was?
14:19 19    A   That would have been about the time that
14:19 20 I got the report back from FDLE and I realized
14:19 21 that he's going to continue to do this and JSO is
14:19 22 not going to do anything to stop him. And then
14:19 23 when I found out the other officers had done the
14:19 24 same thing, I'm just pretty much characterizing
14:19 25 it as this is the culture of JSO, and I'm not

FIRST COAST COURT REPORTERS

67

14:19 1 going to let it ruin my day anymore.
14:19 2    Q   You had testified earlier that this was
14:20 3 on the news; correct?
14:20 4    A   Yes.
14:20 5    Q   And the only thing the news reported was
14:20 6 your name.
14:20 7    A   A name, I believe my rank and years of
14:20 8 service.
14:20 9    Q   And they reported all the other
14:20 10 firefighters involved as well, their names and
14:20 11 service.
14:20 12    A   Yes, sir.
14:20 13    Q   What date was that, that you recall?
14:20 14 When did the news officially find out about it?
14:20 15 Was it the next day --
14:20 16    A   No.
14:20 17    Q   - that they reported it or was there a
14:20 18 time --
14:20 19    A   I believe there were like a couple of
14:20 20 like the social — I think it was on News 4 Jax,
14:20 21 and it was under like the social events, and I
14:20 22 believe there were some pictures that were out
14:20 23 the next day.
14:20 24        I don't think it hit -- the event was on
14:20 25 a Thursday night. I don't think it hit the

FIRST COAST COURT REPORTERS

68

14:20 1 mainstream news until Monday morning.
14:20 2    Q   What effect did that being broadcast the
14:21 3 way it did have on you emotionally?
14:21 4    A   It's embarrassing as hell to be
14:21 5 portrayed in a light that's not factual.
14:21 6    Q   Were people calling you when they saw
14:21 7 the news?
14:21 8    A   People as in coworkers, friends,
14:21 9 family --
14:21 10    Q   Yes.
14:21 11    A   -- yes.
14:21 12    Q   Did people seem to believe it?
14:21 13    A   No. Everybody was in complete disbelief
14:21 14 that my name was even associated with something
14:21 15 like that.
14:21 16    Q   Were you upset from the news reporting
14:21 17 what they did?
14:21 18    A   I'm not understanding what you're
14:21 19 asking.
14:21 20    Q   Like, was it emotional for you?
14:21 21        I just want to try to clarify the effect
14:21 22 the news had on you just from the actual incident
14:21 23 itself emotionally.
14:21 24    A   I took it with a grain of salt that this
14:21 25 is Jacksonville, and it's very conservative, and

FIRST COAST COURT REPORTERS

69

```
14:21  1   it's run by the First Baptist Church, and it's
14:21  2   going to be slanted one particular way.
14:21  3        I've seen them do that with events that
14:21  4   happened within the fire department or JSO, as in
14:21  5   calls that happened or scenes in progress when
14:22  6   reporters show up. They don't give an accurate
14:22  7   reflecting or accounting of what's going on.
14:22  8        So I took it with a grain of salt. It's
14:22  9   embarrassing, but people who know me know that I
14:22 10   didn't do what I was being accused of. And it
14:22 11   was somewhat satisfying to know my friends were
14:22 12   calling me going, You didn't do this. What the
14:22 13   hell? It wasn't...
14:22 14        Q   Did you seek any help or call EAP as a
14:22 15   result of the news incident and the news reports?
14:22 16        A   I don't believe I did, no. Again, I
14:22 17   don't trust anything to do with the city. EAP is
14:22 18   a direct line back.
14:22 19        Q   And that's officially -- I know you've
14:22 20   talked about having distrust for these officers
14:22 21   that looked up your information.
14:22 22        The news -- and that charity event and
14:22 23   the news report on it obviously happened well
14:22 24   before you found out about these officers looking
14:22 25   up your information; right?
```
FIRST COAST COURT REPORTERS

70

```
14:22  1        A   Correct.
14:23  2        Q   And you already said you had distrust
14:23  3   for the police even when the news reported on it.
14:23  4        So, I guess, when did this distrust
14:23  5   develop? Was it all from Sergeant Collier, or
14:23  6   were there other incidents even before?
14:23  7        A   No. Just in general you see -- just
14:23  8   things that you see working in the street.
14:23  9        Knowing some of the disciplinary
14:23 10   problems that JSO has within the department that
14:23 11   they don't handle, going all the way to the civil
14:23 12   service board and people being allowed to keep
14:23 13   their positions, it baffles people.
14:23 14        And it's either -- and I just have to
14:23 15   accept it's either a technicality of somebody
14:23 16   screwed up in the paperwork and that's why the
14:23 17   person wasn't terminated, or the politics of this
14:23 18   city and certain agencies are so inbred that
14:23 19   there is no separation of church and state.
14:23 20        Q   So when you found out that these
14:23 21   officers accessed your information, did it only
14:23 22   confirm your distaste and displeasure for the
14:23 23   Sheriff's Office because you had already had it,
14:23 24   or did it enhance it?
14:24 25        A   It made it very personal. Before it
```
FIRST COAST COURT REPORTERS

71

```
14:24  1   didn't personally affect me. It was just an
14:24  2   observation. Now it affects me.
14:24  3        I guess, before it was an abstract. Now
14:24  4   it's more of a concrete. Now it directly impacts
14:24  5   my day and my life.
14:24  6        Q   And what -- you distinctly -- you can
14:24  7   say for certain in your mind that the injury and
14:24  8   distaste that you have for the Sheriff's Office
14:24  9   came simply because of what these officers did in
14:24 10   looking at your information?
14:24 11        A   I would say that's the major guiding
14:24 12   force of it, yeah.
14:24 13        Q   But when you looked up and found out
14:24 14   that other officers had accessed your information
14:25 15   justifiably, that had no effect on you.
14:25 16        A   I'm not understanding what you're
14:25 17   asking.
14:25 18        Q   For instance, you brought up the school
14:25 19   board officer that was looking for a C. C.
14:25 20   Buckner.
14:25 21        A   Uh-huh (affirmative response).
14:25 22        Q   And your information came up in that
14:25 23   query.
14:25 24        A   Okay.
14:25 25        Q   So that officer looked at the same
```
FIRST COAST COURT REPORTERS

72

```
14:25  1   information these other five officers did; right?
14:25  2        A   Correct.
14:25  3        Q   But --
14:25  4        A   I believe it's six, but, yes.
14:25  5        Q   But he had justifiable reason because he
14:25  6   had a query with C. C. Buckner.
14:25  7        A   Right. I don't have a problem with an
14:25  8   officer who has a legitimate use for a law
14:25  9   enforcement database accessing my information as
14:25 10   part of a query.
14:25 11        I have a very different view of an
14:25 12   officer specifically putting in my information,
14:25 13   looking at my personal information for no reason
14:25 14   other than personal gain. I have a huge problem
14:25 15   with that.
14:25 16        Q   And what personal gain do you think they
14:25 17   had by looking up your information?
14:25 18        MR. DeMAGGIO: Object to form. You can
14:25 19        answer.
14:25 20        Q   You can still answer it.
14:25 21        A   I don't know -- I don't know what the
14:25 22   purpose of it was. Was it just to get their
14:25 23   rocks off sitting in the car at midnight by
14:26 24   themselves? Was it because they've got some sick
14:26 25   fetish with female firefighters? I don't know.
```
FIRST COAST COURT REPORTERS

73

14:26 1 But at the end of the day, it's not right.

14:26 2 And they acknowledge that when they log

14:26 3 onto those systems and they say that this is for

14:26 4 official use only, and they decided to bypass it

14:26 5 and they did it anyway. I have a huge problem

14:26 6 with that.

14:26 7 Q Is there any other damages -- I know

14:26 8 that Mr. Phillips had went through damages from

14:26 9 looking at your DAVID. Are there damages that

14:26 10 you're claiming by Mr. Collier with regard to

14:26 11 this incident that are separate from him looking

14:26 12 at your DAVID information?

14:26 13 A I don't understand what you're asking.

14:26 14 Q Is there any other incidents involving

14:26 15 Officer Collier and your personal relationship

14:26 16 that attributed to any of your damages that you

14:27 17 have now?

14:27 18 A I'm not trying to be difficult. I still

14:27 19 don't understand.

14:27 20 Q You've addressed that -- I guess, in

14:27 21 this lawsuit you're suing because they looked at

14:27 22 your information; correct?

14:27 23 A Correct.

14:27 24 Q Is there anything else that Officer

14:27 25 Collier did that attributes to that, other than

FIRST COAST COURT REPORTERS

74

14:27 1 looking at your information?

14:27 2 A No, because before, if it was just

14:27 3 Sergeant Collier and it was Sergeant Collier just

14:27 4 being a jerk, I can avoid him. He's one person.

14:27 5 I've learned to navigate around him and just

14:27 6 leave well enough alone.

14:27 7 You can't navigate when you've got

14:27 8 several officers from several sectors or several

14:27 9 zones doing their own thing with no oversight.

14:27 10 You can't run from 1600 of them, as much as you

14:27 11 may try.

14:27 12 Q So the damages that you're asking for in

14:27 13 the emotional and other that we've talked about

14:27 14 today, Officer Collier is one-sixth attributed to

14:27 15 those damages, not more, in your opinion?

14:27 16 A I think it's all of the culture of JSO

14:28 17 that's responsible for this. They knew that they

14:28 18 did wrong and, when I went to the administration

14:28 19 and asked for help to make it stop and I was

14:28 20 told, It's none of your business how we run this

14:28 21 department, that statement in itself is pretty

14:28 22 damaging. And to be told, You don't get a vote

14:28 23 as the victim of this; you don't get a say; nor

14:28 24 are you entitled to know what happens, law

14:28 25 enforcement as a whole -- I don't know of another

FIRST COAST COURT REPORTERS

75

14:28 1 agency in the state of Florida that would make an

14:28 2 asinine statement like that.

14:28 3 I would say it's the agency as a whole

14:28 4 that's responsible for this.

14:28 5 Q And I think you had clarified, but I

14:28 6 want to get back into it because I had wrote down

14:28 7 kind of what Jon had heard, and I wanted to touch

14:28 8 on what Officer Collier told you when he put you

14:28 9 on notice that other officers were being called

14:29 10 in to IA.

14:29 11 I had wrote down that you learned that

14:29 12 your DAVID was accessed because Collier, Sergeant

14:29 13 Collier, told you that other officers got in

14:29 14 trouble for looking at your DAVID. But that

14:29 15 wasn't the case, I'm assuming, because you said

14:29 16 now that --

14:29 17 A He told me other officers had been

14:29 18 pulled into Internal Affairs. I don't remember

14:29 19 the exact quote. I don't remember exactly what

14:29 20 was said or the context of it other than other

14:29 21 officers were now being investigated.

14:29 22 Q And the subject being, or accessing

14:29 23 your information; right? Like that's how you got

14:29 24 notice to call the Sheriff's Office.

14:29 25 A I believe so, but I don't know an exact

FIRST COAST COURT REPORTERS

76

14:29 1 quote.

14:29 2 Q I'm not asking -- I'm just saying, the

14:29 3 conversation at least involved officers accessing

14:29 4 your information.

14:29 5 A I believe so.

14:29 6 Q Because that's what would have prompted

14:29 7 you to call the Sheriff's Office.

14:29 8 A Yes. And sitting here thinking about

14:30 9 it, it may have had to do with the fact that he

14:30 10 had been repeatedly warned by both family

14:30 11 attorneys on the case at the time, Leave her

14:30 12 alone. And then he all a sudden brings up, Other

14:30 13 officers are being investigated.

14:30 14 And that's what my complaint to the two

14:30 15 family attorneys was, was he won't leave me

14:30 16 alone. He won't stay out of my personal life.

14:30 17 So what other indications would other

14:30 18 officers have to be -- it just -- I don't know.

14:30 19 The flag went up, the bell went off, whatever,

14:30 20 and I called back the next day and talked to

14:30 21 Sergeant Smith.

14:31 22 MR. VOGELSANG: I don't have anything

14:31 23 else.

14:31 24 MR. PHILLIPS: A couple of quick

14:31 25 follow-ups.

FIRST COAST COURT REPORTERS

**77**

REDIRECT EXAMINATION

14:31  2  BY MR. PHILLIPS:
14:31  3      Q  You indicated that you didn't have a
14:31  4  problem with an officer looking up your
14:31  5  information if he had a legitimate reason?
14:31  6      A  Correct.
14:31  7      Q  If Officer Collier actually believed
14:31  8  that your license was suspended, he would have
14:31  9  had a legitimate reason to check that, would he
14:31 10  not?
14:31 11      A  I believe there has to be just cause,
14:31 12  like it has to be a traffic stop or it has to be
14:31 13  a part of an active investigation.  It can't be
14:31 14  because you're in a personal relationship with an
14:31 15  individual.
14:31 16      Q  Well, if he believed that your license
14:31 17  was suspended and he knew for a fact that you
14:31 18  were driving, would that not be a legitimate
14:31 19  reason to look up your information?  If assuming
14:31 20  that he actually did believe your license might
14:31 21  be suspended.
14:31 22      A  I don't think it is.  I think that's
14:31 23  overstepping his professional boundaries.  I
14:31 24  believe that's why they don't allow officers to
14:31 25  investigate their own families or people that

**78**

14:31  1  they have a personal relationship with.
14:31  2          If he believed that that was the case,
14:32  3  then the appropriate measure would have been to
14:32  4  turf it to another officer or another supervisor.
14:32  5  He, in turn, took it upon himself to access my
14:32  6  information without my permission.
14:32  7      MR. DeMAGGIO:  Let me just go back and
14:32  8      object to the form of that previous
14:32  9      question.
14:32 10  BY MR. PHILLIPS:
14:32 11      Q  So it would have been -- assuming that
14:32 12  Officer Collier actually did believe that your
14:32 13  license was suspended, it would have been
14:32 14  perfectly reasonable for him to -- and not a
14:32 15  violation of your rights, to have another officer
14:32 16  check your information?
14:32 17      MR. DeMAGGIO:  Object to form.
14:32 18  BY MR. PHILLIPS:
14:32 19      Q  Correct?
14:32 20      A  If there's a legitimate reason, i.e., a
14:32 21  traffic stop, an active investigation, being
14:32 22  suspected of a crime, then, yes.
14:32 23      Q  You also -- when I asked you about how
14:32 24  you were defamed, you mentioned that Sergeant
14:32 25  Collier had shared your credit report with

**79**

14:32  1  people.
14:32  2      A  Correct.
14:32  3      Q  Your credit report is not accessible
14:32  4  through the DAVID database, is it?
14:32  5      A  I don't believe my credit report is.  I
14:32  6  believe my social security number is, and that is
14:33  7  where he gleaned my information.  I had never
14:33  8  provided that to him.  We had no financial
14:33  9  documents in common up until that point.
14:33 10      Q  You don't believe there's any way that
14:33 11  he could have learned your social security number
14:33 12  during the course of your relationship
14:33 13  culminating in a pregnancy or in raising a child?
14:33 14      MR. DeMAGGIO:  Object to form.
14:33 15      A  No, because the only information
14:33 16  relevant that would have that type of information
14:33 17  would be like my tax returns.  I didn't even have
14:33 18  those in the home where we were living.
14:33 19          There was no information floating around
14:33 20  with my social security number on it that he
14:33 21  would have been able to otherwise glean.
14:33 22      Q  Well, let me rephrase the question.
14:33 23          What information from the DAVID database
14:33 24  did Sergeant Collier disseminate to anybody, to
14:33 25  your knowledge?

**80**

14:33  1      A  Directly from the database or the
14:33  2  information he gleaned?
14:33  3      Q  Directly from the database.
14:34  4      A  I don't know of any information.  I
14:34  5  believe it was the information he used to tie in
14:34  6  to another system, the steppingstone.
14:34  7      Q  Has Sergeant Collier told you that he
14:34  8  was able to get your credit report because he got
14:34  9  your social security number through the DAVID
14:34 10  database?
14:34 11      A  He never disclosed to me how he got my
14:34 12  social security number.
14:34 13      MR. PHILLIPS:  I don't have any other
14:34 14      questions.
14:34 15      MR. DeMAGGIO:  Do you have any, Phillip?
14:34 16      MR. VOGELSANG:  No.
14:34 17      MR. DeMAGGIO:  I don't have any, Ellen,
14:34 18      and we'll read.
14:34 19      MR. PHILLIPS:  Thanks.
     20      (Witness excused.)
     21      (The deposition was concluded at 2:35
     22  p.m.)
     23
     24
     25

81

CERTIFICATE OF OATH

1
2  STATE OF FLORIDA )
3  COUNTY OF DUVAL  )
4     I, the undersigned authority, do hereby
5  certify that the aforementioned witness,
6  personally appeared before me and was first duly
7  sworn to testify the whole truth.
8     WITNESS my hand and official seal this 14th
9  day of March, 2014.
10
11
12
13
        Ellen G. Watterson, RPR
14     Notary Public, State of Florida
       at Large.
15
16         ELLEN G. WATTERSON
17         Commission # DD 982375
           Expires June 7, 2014
18         Bonded Thru Troy Fain Insurance 800-385-7019
19
20
21
22
23
24
25
              FIRST COAST COURT REPORTERS

82

C E R T I F I C A T E

1
2  STATE OF FLORIDA )
3  COUNTY OF DUVAL  )
4     I, Ellen G. Watterson, Registered
5  Professional Reporter and Notary Public, duly
6  qualified in and for the state of Florida, do
7  hereby certify that I was authorized to and did
8  stenographically report the foregoing deposition;
9  and that the transcript is a true record of the
10  testimony given by the witness.
11     I further certify that I am not a relative,
12  employee, attorney or counsel of any of the
13  parties, nor am I a relative or employee of any
14  of the parties' attorney or counsel connected
15  with the action, nor am I financially interested
16  in the action.
17     Dated this 18th day of March, A.D., 2014.
18
19
20
21
22
23
24
25
              FIRST COAST COURT REPORTERS

83

1              E R R A T A   S H E E T
2        This is to certify that I, CANDICE
3  BUCKNER, have read the foregoing transcription of
4  my testimony in re:  Candice Buckner, vs. John
5  Rutherford, et al., Defendants, given on March
6  14, 2014, and find the same to be a true and
7  correct transcription of said testimony with the
8  following changes (if any):
9
10  PAGE  LINE  SHOULD READ:
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20
21
22         _____
              CANDICE BUCKNER
23  Reported by:  Ellen G. Watterson, RPR, FPR
24
25

              FIRST COAST COURT REPORTERS